Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1955 | **DATE** | September 24, 2003 |
| **CASE TITLE** | U.S. ex rel. Taylor v. Pierce | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] After careful consideration of the entire record, Taylor's § 2254 petition [1-1] is denied in its entirety. The clerk is directed to enter a Rule 58 judgment and to terminate this case. Enter Memorandum and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 25 2003 | |
| | Notified counsel by telephone. | | date docketed | 19 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | Date/time received in central Clerk's Office | SEP 25 2003 date mailed notice / mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. MALIK TAYLOR, Petitioner, | ) ) ) ) | |
| v. | ) ) | 03 C 1955 |
| MARK PIERSON, Respondent. | ) ) ) | |

## MEMORANDUM AND ORDER

Following a jury trial in the Circuit Court of Cook County, petitioner Malik Taylor was convicted of first degree murder, home invasion, and two counts of armed robbery. He was subsequently sentenced to twenty-five years of imprisonment for murder, a consecutive term of ten years for home invasion, and two ten year terms for armed robbery, to be served concurrently with each other and the sentence for home invasion. He unsuccessfully pursued a direct appeal and sought collateral relief from the Illinois courts. This petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 followed. For the following reasons, Taylor's petition is denied.

## I. Background

The court will presume that the state court's factual determinations are correct for the purposes of habeas review as Taylor has not provided clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir.2002). The court thus adopts the state court's recitation of the facts. On August 26, 1995, Reginald Young was fatally shot from the back while he was in his home. Young lived with his father Jessie Young and his sisters Jessica and Audra, while his uncle Douglas Carr lived across the street.

DOCKETED

SEP 2 5 2003

19

### A. Jessie Young's Testimony

Jessie testified that on August 26th, he was returning from a family picnic when he noticed a white minivan parked near the corner. Two other vehicles – a brown van and an Oldsmobile Cutlass – were also parked nearby. After several family members entered the house, Jessie saw some men walking down the street and some men leaving the brown van.

As Jessie approached the house, a man put a gun to his wife's head and forced her into the house. Another man, wearing a rust-colored shirt and a baseball cap, put a gun to Jessie's head and forced him into the house. After Jessie said that he did not have keys to the upstairs unit, the intruder taped his mouth, nose, eyes, and feet with duct tape. Because his hands were free, Jessie was able to pull some of the tape loose.

The lights went out. He then heard a noise from Audra's bedroom upstairs and a man tell some other family members to go into the living room and to be quiet. Jessica was taken to the kitchen, Reginald and his brother Ivan were struck and taped, and Audra was taken down the hall. Reginald was forced to kneel over a recliner with his hands taped. Jessie heard someone speak into a walkie-talkie, then heard two shots and heard Reginald groan.

### B. Jessica Young's Testimony

Jessica Young testified that, when she returned from the picnic, it was dusk and the street lights were operating. She saw a man wearing black pants and a ragged white T-shirt walk past the house. She thought he had been taking drugs. When the man saw her watching him, he crossed the street and entered a white Astro van. After her father arrived home, Jessica saw another man who was wearing gold shorts and a white T-shirt with gold in it and was carrying a

walkie-talkie. Jessica identified the defendant in open court as the man who had crossed the street.

Jessica then saw a man wearing a rust-colored shirt and a baseball cap march her father into the house. Another man grabbed her by the hair, threatened to "pop" her if she screamed, and took her page and cell phone. She saw other family members on the floor and heard someone say that they would all have to "pay" because the intruders had been sold bad drugs. A man hit her on the head with a gun, asked her where the drugs were, and walked her to her bedroom. After Jessica turned over a bag of marijuana and some jewelry, she was taken back to the living room and her legs were taped. Jessica then heard someone leave through the back door. Another man asked Reginald where the drugs were, and then shot him twice. Ivan called the police but Reginald choked on his blood and died before help arrived.

On cross-examination, Jessica testified that she saw Taylor for the first and only time on the night of the murder. She denied telling the police that he wore glasses and was over six feet tall. On the evening of the shooting, Jessica failed to identify Taylor in a photo line-up. She said that the man she chose had been pacing back and forth outside her home on the night of the murder.

### C.  Audra Young's Testimony

Audra Young testified that, when she entered the house, someone came up from behind her with a gun and took $60 from her pocket. That man was wearing a white shirt, white jogging pants, and white sneakers. She did not see anyone wearing shorts. Once she was in the house, she saw other family members on the floor inside the house. A man took her to the kitchen and questioned her about drugs. She managed to flee the house and hide. When she returned, the door to the second floor apartment had been smashed in and her bedroom had been ransacked.

### D. Douglas Carr's Testimony

Douglas Carr testified that he did not go to the picnic and that he noticed some unattended coolers outside the Young residence that day. From the vantage point of his house across the street, he saw Reginald, Ivan, and Audra enter the house. From a distance of about sixty feet, Carr saw a man whom he identified in court as Taylor leave the house. Carr had never seen Taylor before that night. Taylor looked at Carr, dropped his head, and shuffled money in his hands. According to Carr, Taylor was wearing brown or green pants and a green and dark brown shirt. Carr also saw another man leave the house and speak into a walkie-talkie.

A few minutes later, that man returned to the house. Carr attempted to call the police and then heard two shots. He saw Taylor and another man leave the Young house, enter a dark yellow van with brown stripes, and drive away. Carr identified Taylor in a line-up as the first man he saw leaving the Young's house.

On cross-examination, Carr testified that he told the police that the first man who left the house wore a patterned shirt and brown or gray pants. He denied giving the police a height or weight description, and denied seeing anyone on the night of the murder wearing gold shorts. He did not recall telling the police that he saw Taylor march two people into the Young home at gunpoint. He was unable to identify Taylor in a photo line-up two weeks after the shooting. Instead, he identified Taylor's co-defendant, Michael Taylor.

### E. Other Evidence

The parties stipulated that Reginald died as a result of two gunshot wounds to the back. A Chicago police forensic investigator testified that he recovered two spent casings and an expended bullet from the Young house. He photographed the scene and processed the house for fingerprints. No prints were recovered from the casings or from the duct tape and walkie talkie

- 4 -

which were found in the house. An expert latent fingerprint examiner was unable to match prints from the house and prints from a brown van where Taylor had been.

Chicago police officer John Halloran testified for the defense. At trial, he acknowledged that his police report stated that Jessica had told him that Taylor had spoken to her. He also denied that Jessica had told him this. He also acknowledged that his police report stated that Carr told him that Taylor had pointed a gun at the Young family. At trial, he said he meant to refer to another defendant. He never filed an amended police report.

The parties stipulated that Detective Paluch would testify that Carr viewed photos on the night of the shooting and said that the first stranger he saw leave the Young's home was an individual other than Taylor. According to Paluch, Carr also told him that the first person who left the house did not return but the second person who left the house did return.

The parties also stipulated that Detective Myles would testify that Carr said that the first person who left the house was six-foot-two-inches tall and weighed 220 pounds. Carr also told Detective Myles that he saw a third man, who was dark-complected and wearing a head band, leave the house. Finally, the parties stipulated that Detective Zalatoris would testify that Jessica told him that the assailant was six-foot-one to six-foot-two, wore glasses, a white shirt, and gold shorts. His notes did not contain any specifics regarding the suspect's weight, build, hairstyle, complexion, or facial hair.

## II.  Procedural Posture

Taylor unsuccessfully appealed his convictions and sentence to the Illinois Appellate Court, contending that the State had failed to prove that he was guilty beyond a reasonable doubt. He also filed an unsuccessful petition for leave to appeal ("PLA") with the Illinois Supreme Court which raised this same argument.

He then filed a petition for state post-conviction relief with the Circuit Court of Cook County. In his petition, he contended that:

(1) his trial counsel was ineffective because he failed to: (a) object to the State's accountability theory and the State's characterization of him as a gang member or (b) offer mitigating evidence at sentencing;

(2) his appellate counsel was ineffective because he failed to: (a) challenge the sufficiency of the State's evidence, (b) argue that the trial court's refusal to permit the jury to view police reports during deliberations deprived him of a fair trial, (c) argue that the trial court's imposition of consecutive sentences was erroneous, and (d) argue that trial counsel was ineffective; and

(3) his consecutive sentences violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

After the Circuit Court rejected these arguments, Taylor appealed and his attorney sought leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). In response, Taylor argued that: (1) the Circuit Court erred when it found that he had waived his trial court ineffective assistance claim based on counsel's failure to object to the State's accountability theory; (2) insufficient evidence supported his murder conviction under an accountability theory; and (3) the Circuit Court abused its discretion by allowing the State to give the jury a definition of accountability. The Illinois Appellate Court affirmed the judgment of the Circuit Court and permitted counsel to withdraw.

Taylor filed a PLA with the Illinois Supreme Court raising the same three arguments he had raised before the Illinois Appellate Court. The Supreme Court denied Taylor' PLA. This § 2254 petition followed. Taylor contends that: (1) the State failed to prove that he was guilty beyond a reasonable doubt; (2) trial counsel was ineffective because he failed to object to the

State's accountability charge; and (3) the Circuit Court abused its discretion by allowing the State to give the jury a definition of accountability.

## II. Discussion

### A. Threshold Matters

The court will begin by summarizing the rules governing exhaustion and procedural default and by recapping the standard of review that guides this court in resolving Taylor's § 2254 petition.

#### 1. Exhaustion and Procedural Default

Before this court may reach the merits of Taylor's federal habeas claims, it must consider whether he has exhausted his state remedies and avoided procedural default under Illinois law. *See Mahaffey v. Schomig*, 294 F.3d 907, 914-15 (7th Cir.2002).

##### a. Exhaustion of State Court Remedies

To exhaust state court remedies, a petitioner must give the state courts an opportunity to act on each of his claims before he presents them to a federal court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). State remedies are exhausted when they are presented to the state's highest court for a ruling on the merits or when no means of pursuing review remain available. *Boerckel*, 526 U.S. at 844-45, 847; 28 U.S.C. § 2254(c). Here, the respondent does not dispute that Taylor has exhausted his state court remedies. This is correct, as Taylor sought state post-conviction relief and filed a PLA in both his direct and collateral appeals.

##### b. Procedural Default

Procedural default occurs when a petitioner fails to comply with state procedural rules. *Mahaffey*, 294 F.3d at 915. This occurs when the petitioner fails to pursue all appeals required by state law, *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), or fails to fully and fairly

present his federal claims to the state court, *Boerckel*, 526 U.S. at 844. It also occurs when the state court did not address a federal claim because the petitioner failed to satisfy an independent and adequate state procedural requirement. *Stewart v. Smith*, 536 U.S. 856 (2002). If an Illinois appellate court finds that a claim is waived, that holding constitutes an independent and adequate state ground. *Rodriquez v. McAdory*, 318 F.3d 733, 735 (7th Cir.2003).

Nevertheless, this court may still reach the merits of a procedurally defaulted claim if the petitioner establishes either cause for his failure to follow a rule of state procedure and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To establish a fundamental miscarriage of justice, the petitioner must present new and convincing evidence of his innocence by showing that it is more likely than not that no reasonable juror would convict him in light of the new evidence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

### 2. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). In *Williams,* the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See id.* at 405.

With respect to the "unreasonable application" prong under § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *See Lockyer v. Andrade,* 123 S.Ct. 1166, 1174 (2003) (unreasonable application more than incorrect or erroneous). In order to be considered unreasonable under this standard, a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *See Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002); *see also Searcy v. Jaimet,* 332 F.3d 1081, 1089 (7th Cir. 2003) (decision need not be well reasoned or fully reasoned and is reasonable if one of several equally plausible outcomes); *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (reasonable state court decision must be minimally consistent with facts and circumstances of the case).

### B. Taylor's Claims

#### 1. The State's Alleged Failure to Prove Guilt Beyond a Reasonable Doubt

Taylor takes issue with the testimony of "two individuals" who did not see his face and who gave differing descriptions of his clothing. He also notes that one of these individuals failed to select him from a line-up but later changed his mind, and that this person saw the alleged perpetrator from a fifty-foot distance when it was late in the evening and thus dark. The court assumes that Taylor is referring to Jessica Young and Douglas Carr.

As noted above, § 2254 relief is only appropriate if the state court's decision was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the

facts in light of the evidence. 28 U.S.C. §§ 2254(d)(1) & (2). In its decision affirming Taylor's conviction, the Illinois Appellate Court correctly summarized the standard of review for appeals challenging the sufficiency of the evidence. Specifically, it evaluated the evidence in the light most favorable to the State to determine if a rational trier of fact could have found Taylor guilty beyond a reasonable doubt, citing to *People v. Nitz*, 143 Ill.2d 82, 95-96 (Ill. 1991).

It also noted that identification testimony must be evaluated based on: (1) the witnesses' opportunity to view the offender at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' description of the offender; (4) the level of certainty demonstrated by the witness at the time of the first identification; and (5) the length of time between the crime and the first identification, citing to *People v. Slim*, 127 Ill.2d 302, 307-08 (Ill. 1989).

The Illinois Appellate Court then outlined the evidence supporting Taylor's conviction and found that it was adequate to support the jury's verdict. This court concludes that this decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). First, *Jackson v. Virginia*, 443 U.S. 307 (1979), contains the relevant standard for direct appellate review. In *Jackson*, the Supreme Court held that a conviction must stand if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. Although the Illinois Appellate Court did not cite to *Jackson v. Virginia*, it cited to an Illinois Supreme Court case that uses the *Jackson* standard, and then applied this rule to assess whether sufficient evidence supported Taylor's conviction. This is enough to satisfy the AEDPA. *See Early v. Packer*, 537 U.S. 3, —, 123 S.Ct. 362, 365 (2002)

(state courts not required to cite Supreme Court cases as long as reasoning or result of the court's decision does not contradict Supreme Court precedent).

Second, the Illinois Appellate Court correctly summarized the principles governing identification testimony. Moreover, the case cited by the Illinois Appellate Court – *People v. Slim* – cites to the governing United States Supreme Court case, *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), and repeats the applicable standards from that case. *See Early v. Packer*, 123 S.Ct. at 365. Thus, the state court's decision is not contrary to clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The court thus turns to the second prong of § 2254(d)(1): whether the state court's decision is an unreasonable application of clearly established Supreme Court precedent. As noted above, to satisfy this standard, the state court's decision only needs to be minimally consistent with the facts and circumstances of this case. Here, the Illinois Appellate Court found that: (1) Jessica and Carrr positively identified Taylor one month after the shooting; (2) Taylor was walking withing twenty feet of Jessica in a street-lit area until he saw her watching him and crossed the street; (3) Carr saw Taylor from across the street and was able to observe him and see that he was shuffling money in his hands before Taylor dropped his head.

The Illinois Appellate Court also stated that, although Taylor claims that the witnesses were not paying attention to him on the night of the murder, both Jessica and Carr testified that they noticed unusual activity – Jessica thought that Taylor was a drug user and Carr saw some unattended coolers outside the Young residence – and had an ample opportunity to observe Taylor. It is true that at trial, Jessica and Carr's descriptions of Taylor's clothing on the night of the murder did not match up. These differences go to the weight of the witnesses' testimony, however, not its admissibility. In other words, the State is not required to present 100%

consistent testimony to support a jury's finding of guilt beyond a reasonable doubt. *See U.S. v. Fleming*, 504 F.2d 1045, 1048 (7th Cir. 1974); *U.S. ex rel. Kubat v. Thieret*, 679 F. Supp. 788, 803 (N.D. Ill. 1988).

In addition, other testimony by Carr and Jessica was corroborated by other witnesses. Both Jessica and her father testified about seeing men on the street and the fact that her father was marched into the house. Jessica, Audra, and their father all testified to substantially the same events inside the house. Carr and Young observed the same van on the street and multiple witnesses testified about the walkie-talkie, which was recovered at the house after the murder. This evidence, when viewed in the light most favorable to the State, further buttresses the general veracity of Jessica and Carr's testimony.

Moreover, the fact that on the night of the shooting Jessica and Carr selected photographs from a line-up that were not pictures of Taylor does not automatically undermine the jury's verdict. Jessica and Carr identified Taylor as being at the scene approximately one month later. Identification testimony turns on numerous factors, so a witness's failure to consistently identify a defendant is not fatal. *See Neil v. Biggers*, 409 U.S. at 199-200.

In addition, the record reflects that counsel cross-examined Jessica and Carr regarding the line-up and their description of the clothing allegedly worn by Taylor. The jury was entitled to choose to give greater credence to the evidence inculpating Taylor and to reject the inconsistencies which would tend to exculpate him because the issue before the court is not whether the state court proceedings could have ended differently if Taylor's view of the facts had carried the day. Instead, it is whether the state court's decision is subject to attack under 28 U.S.C. § 2254(d)(1) or (2). When the evidence is evaluated in the light most favorable to the State, it is clear that a rational trier of fact could have found Taylor guilty beyond a reasonable

doubt. Thus, he is not entitled to habeas relief based on Jessica and Carr's identification testimony.

### 2. Ineffective Assistance

Taylor also argues that his trial counsel was ineffective because counsel failed to object to the State's accountability charge. Taylor was charged with first degree murder because the State claimed he was the principal shooter but the State argued at trial that he was guilty as an accomplice. According to Taylor, the trial court erred when it permitted the State to change gears at trial because the indictment did not charge him under an accountability theory.

To render effective assistance of counsel under the Sixth Amendment to the United States Constitution, counsel's performance must satisfy the well-known *Strickland* standard. *See Strickland v. Washington*, 466 U.S. 668, 687-91 (1984). Under the first prong of the *Strickland* standard, Taylor must show that his counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. The second *Strickland* prong requires Taylor to establish that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* at 694. If a defendant fails to satisfy one of the *Strickland* prongs, the court's inquiry under *Strickland* ends. *See id.* at 697; *see also Hough v. Anderson*, 272 F.3d 878, 890 (7th Cir. 2002).

Taylor's argument is premised on the assumption that the State was required to charge him under an accountability theory. The Illinois Supreme Court, however, has held that, "[a] charge based on accountability must necessarily flow from the principal crime at issue. Accountability is not in and of itself a crime. Rather, the statute is a mechanism through which a criminal conviction may be reached. In essence, accountability provides an alternative basis of

liability, not an additional basis for liability." *People v. Hicks*, 181 Ill.2d 541, 547 (Ill. 1998) (internal citations omitted).

Thus, Taylor's position regarding accountability is incorrect, and any arguments regarding this argument would have been unavailing. Counsel is not required to raise a losing argument. *See Rodriguez v. United States*, 286 F.3d 972, 985 (7th Cir. 2002) (attorney's failure to raise a losing argument is not unreasonable and thus does not provide grounds for a finding of ineffectiveness). Consequently, with respect to Taylor's accountability theory, Taylor's counsel satisfied the objective standard of reasonableness required by *Strickland*.

### 3. Accountability

Finally, Taylor argues that the trial court abused its discretion by allowing the State to give the jury a definition of accountability, and that the jury should have been allowed to provide its own interpretation of the jury instructions' use of the word "accountability." The respondent contends that Taylor defaulted this argument by failing to present it to the trial court.

A defendant must present his constitutional claims to the state trial, appellate, and highest courts to avoid procedural default. *See generally O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The failure to present a claim to the state trial court usually constitutes an independent and adequate state procedural ground which precludes habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977); *Dressler v. McCaughtry*, 238 F.3d 908, 912-13 (7th Cir. 2001). However, if the state appellate court overlooks a defendant's waiver, a federal court may consider the merits of the claim. *See, e.g., Coleman v. Thompson*, 501 U.S. at 729.

Here, Taylor raised his jury instruction argument for the first time at the appellate level when he responded to his counsel's motion to withdraw under *Finley*. The Illinois Appellate Court allowed counsel to withdraw and affirmed the trial court. A motion to withdraw pursuant


to *Finley*" necessarily implicates the merits of an appeal, because . . . . [i]n deciding whether to allow the withdrawal, the court must . . . examine the substance of the case to determine whether there are any issues of arguable merit." *Wilkinson v. Cowan*, 231 F.3d 347, 351 (7th Cir. 2000). Thus, the Illinois Appellate Court arguably reached the merits of Taylor's jury instruction argument as opposed to relying on the independent and adequate state law ground of waiver. *See id.* at 351-52.

There is certainly some charm to the argument that the state appellate court's implied consideration of the merits is not enough to overcome Taylor's waiver at the trial court level. Accepting the affirmance as a merits ruling would require this court to consider whether a non-existent state court ruling comports with the U.S. Constitution, as neither the trial court nor the appellate court made any specific findings as to Taylor's jury instruction argument.

The court, however, need not dwell on the metaphysical aspects of the independent and adequate procedural ground doctrine as Taylor's argument is patently meritless. A party generally may not take issue with a jury instruction if he fails to object to it before the jury retires. *Jones v. U.S.*, 527 U.S. 373, 387 (1999). Here, Taylor does not claim that he objected. Instead, he asserts that the trial court erred when it sua sponte failed to correct the State's proffered instruction.

As a general rule, "the trial court has no obligation to instruct on its own motion." *People v. Jovicevic*, 63 Ill. App. 3d 106, 116 (1st Dist. 1978), *citing People v. Parks,* 65 Ill.2d 132, 137 (Ill. 1976). Thus, the trial court's alleged duty to correct the State's instruction would arise, if it existed at all, under Illinois law as an exception to this general rule. However, "§ 2254 cannot be invoked simply to require state officials to comply with state law or to review alleged violations of state law." *Biskup v. McCaughtry*, 20 F.3d 245, 247 (7th Cir. 1994). This principle dooms

Taylor's argument based on the state court's failure to sua sponte object to the State's jury instruction regarding accountability. *See* 28 U.S.C. § 2254(a) (habeas relief is only available if a petitioner establishes that "he is in custody in violation of the Constitution or laws or treaties of the United States").

There are only two federal claims that could possibly arise out of the jury instruction regarding accountability. First, the trial court's failure to sua sponte correct the instruction could potentially have prevented Taylor from receiving a fair trial under the due process clause. Second, trial counsel could potentially have rendered constitutionally ineffective assistance by failing to object. Neither of these arguments were presented to the state courts so they are barred. *Verdin v. O'Leary*, 972 F.2d 1467, 1474-75 (7th Cir.1992) (a petitioner need not cite "book and verse of the federal constitution" to present a constitutional claim but he must "raise the red flag of constitutional breach" in state court or his claims will be barred in federal court).

In any event, Taylor does not contend that the instruction was erroneous. Instead, he claims that the jury should have been left to formulate its own definition of accountability. An accurate instruction does not prevent a defendant from receiving a fair trial, and counsel is not required to raise fruitless objections. Thus, Taylor's jury instruction claim fails.

### III. Conclusion

For the above reasons, Taylor's § 2254 petition [1-1] is denied.

DATE: SEP 2 4 2003

Blanche M. Manning
United States District Court Judge

03cv1955.hab